IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 3, 2008

## GERALDRICK JONES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-13085     W. Mark Ward, Judge**

_____

**No. W2007-01454-CCA-R3-PC  - Filed July 29, 2008**

_____

The petitioner, Geraldrick Jones, was convicted of first degree premeditated murder and sentenced to life without the possibility of parole.  Following an unsuccessful direct appeal, he sought post-conviction relief, alleging that he received ineffective assistance of counsel.  Specifically, he alleged that trial counsel (1) should have requested dismissal of the indictment or a special jury instruction after the State lost samples of his blood; (2) should have moved to suppress evidence found after the police searched his home; (3) and failed to object to improper closing remarks by the State.  The post-conviction court concluded that the petitioner failed to prove these claims and dismissed the petition.  Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Geraldrick Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

We derive the relevant factual background from the petitioner's direct appeal of his conviction:

Kathaleen Champion, the mother of the victim, Natosha Hampton, testified that she last saw her daughter alive on May 28, 1998, at their shared residence in Memphis. The victim left at approximately 7:00 to 7:30 p.m. with her friend,

Michelle Caery, whom the victim referred to as her aunt. Ms. Champion stated that the victim worked at the Dixie Boys and Girls Club and at Sycamore View Nursing Home. She said the victim had an unknown amount of money in her purse, but Ms. Champion had repaid the victim $140 that day, for a previously existing debt. Ms. Champion warned her daughter that the purse she was carrying allowed someone to easily take the money out of the top. The warning was unheeded, and the victim took the purse. The victim had a car payment due the following day in an amount Ms. Champion recalled as being between $200 to $300. Ms. Champion described the victim's attire as black Guess jeans, a black shirt, and a black sheer blouse on top. The next time Ms. Champion saw the victim was at the funeral home where she viewed the body.

Michelle Caery testified that she had known the victim about twelve years, had a "pretty close" relationship with the victim, and referred to her as a niece. Ms. Caery had known the [petitioner], Geraldrick Jones, since January of 1998. She had introduced the victim and [petitioner] about one and one-half months before their first date on May 28, 1998. Ms. Caery had picked up the victim and taken her to the [petitioner's] home on Meda Street. Ms. Caery said the [petitioner] was not at home when they first arrived, but came ten to fifteen minutes later. Ms. Caery and her boyfriend left but had planned to have breakfast at the [petitioner's] home the following morning. Ms. Caery arrived there at 9:30 or 10:00 a.m. on May 29, without knowledge of the intervening events. Ms. Caery testified she had never observed the victim use drugs or alcohol. She said the victim had her purse when she last saw her, and the victim had expressed her intention to return to her home that night.

Kevin Ward had known the [petitioner] for eight or nine years and was his roommate and close friend. In their shared residence, there was one bedroom which was used by the [petitioner]. Mr. Ward slept in the living room on a long couch. Ward recalled that on May 28, 1998, the victim came to the [petitioner's] residence with Michelle Caery. He said no one else was present but, at Caery's request, he paged the [petitioner], who arrived fifteen to twenty minutes later at approximately 10:00 p.m. The two couples left, but the [petitioner] and victim returned with food. Ward and the [petitioner] drank whiskey and smoked marijuana while watching television. The victim did not participate in the marijuana smoking or drinking of whiskey.

The [petitioner] signaled Ward to leave, and he went to a house next door, occupied by two older men. While there, Ward and one of his companions drank the remainder of the whiskey. Ward returned to the [petitioner's] residence after about two hours and was met at the door by the [petitioner]. Ward and the [petitioner] ingested cocaine. The [petitioner] asked Ward to go and get more cocaine. Ward returned about 3:00 a.m. and heard laughing and giggling from the [petitioner's]

-2-

bedroom. The [petitioner] came back to the living room, and he and Ward ingested more cocaine.

At approximately 4:00 a.m., the [petitioner] returned to the bedroom, and Ward went to sleep. Ward woke to the sound of screams coming from the bedroom. Upon Ward's entry, he saw the [petitioner] striking the victim in the head with a five-pound weight. Ward asked the [petitioner] what he was doing, and the [petitioner] replied that the victim had tried to steal his money. Ward asked if the [petitioner] had recovered the money, and the [petitioner] said yes. Ward then told the [petitioner] to let the victim go, and the [petitioner] responded that he could not as it would violate his probation. The [petitioner] kept hitting the victim, and Ward pulled him away. The victim then pushed both the [petitioner] and Ward into the living room where Ward fell on the couch. Ward saw blood on the bed, on the walls, and on the [petitioner]. From the couch, Ward rolled onto the floor while the [petitioner] was on top of the victim, striking her with his fist. Ward pulled the [petitioner] off of the victim, who attempted an escape down a hallway leading to the kitchen. The [petitioner] caught the victim in the hallway and began striking her with the weight again. Ward estimated the [petitioner] had struck the victim with the weight more than five times while in the bedroom and "several" more times in the hallway. The victim appeared unconscious to Ward as she lay half in the bathroom and half in the hallway. Ward described a pool of blood near the victim and could tell she was bleeding from the head. Ward also saw blood on the [petitioner's] chest, abdomen, arms, and hands. Ward stated that the [petitioner] threw down the weight and obtained a knife from the kitchen.

Ward stated the [petitioner] said he was going to cut the victim up and wanted Ward's assistance. When the [petitioner] turned toward the victim, Ward grabbed his shoes, ran to a nearby service station, and called the police. Ward did not go back into the house that morning. Ward stated that the victim was clothed in black pants and a black thin shirt with possibly a black bra.

On cross-examination, Ward stated that the victim was bigger than the [petitioner]. He recounted that the [petitioner] dropped the weight when the victim pushed him from the bedroom. After Ward grabbed the [petitioner] a second time, the victim attempted to run through the hallway but was grabbed by the [petitioner], and the [petitioner] began striking the victim with the weight again. Ward estimated that he and the [petitioner] drank a pint of Crown Royal and had shared five or six marijuana joints and about two and one-half grams of cocaine. Ward admitted he was drunk and high and also believed the [petitioner] was as well.

Ward acknowledged that he gave a statement to Officer A.J. Christian of the Memphis Police Department on May 29, 1998. He did not mention a bread knife being in the [petitioner's] possession in that five-page statement. Neither did he

-3-

make mention of the violation of the [petitioner's] probation statement. Ward also failed to mention the [petitioner's] probation during his preliminary hearing testimony. Also, during that testimony, Ward denied seeing any other weapon. Ward said that he thought the questioner was referring to a gun. Ward admitted that he did not know if the victim was unconscious or dead at the time she lay in the hallway and restroom. Ward did hear the [petitioner] say, "I believe she dead." Ward said the [petitioner] made this statement before the [petitioner] got the knife. On redirect, Ward stated the victim was trying to cover herself from the [petitioner's] blows. He did not see the [petitioner] cut the victim with the knife.

Officer Dennis Norman of the Memphis Police Department was the next witness called by the State. On May 29, 1998, he was working as a uniform patrol officer on the midnight shift. A few minutes before 7:00 a.m., Norman received a dispatcher's report of a killing at 1224 Meda Street. He drove to the address and knocked on the front door without any response. He was then joined by his patrol partner, Officer Johnson. Together they attempted to look in the windows and knocked on the door several times over a period of fifteen to twenty minutes. By looking in a kitchen window, Norman saw the victim's leg in the hallway.

The front door was forced open, and the two officers entered. Officer Norman immediately saw the [petitioner] face down on his stomach with his eyes closed. He could also observe the victim lying face up in the hallway. Norman described her as partially naked, with her throat severely cut, and also with her arm cut to the bone at the shoulder. The paramedics followed the officers in the house and began checking the [petitioner]. Norman observed the [petitioner] had blood on his torso, chest, sides, and ribs. The [petitioner] stated that he opened his door in response to a knock and was knocked unconscious. The [petitioner] was taken to the hospital due to his injury claim. The [petitioner] was wearing only boxer shorts. While the [petitioner] was on the gurney, Norman noticed blood on the soles of the [petitioner's] feet with leaves and dirt. After the [petitioner's] release from the hospital, Norman transported him to 201 Poplar for questioning. Norman was asked if the [petitioner] appeared to be under the influence of alcohol or drugs. Norman said that he did not smell alcohol, that the [petitioner's] eyes were pretty clear, and that the [petitioner's] speech was understandable. Norman did not believe the [petitioner] was under the influence. On cross-examination, Norman confirmed that the dispatcher reported a call from a person who said their roommate had killed a person, and the caller then ran from the scene.

Shan Tracy, a Memphis police officer in the crime scene unit, was next to testify. He was sent to 1224 Meda Street on the morning of May 29, 1998, and prepared a sketch of the area. Tracy described where blood appeared and the location of the victim in the hallway. In the bathroom, he saw a large black-handled knife with a serrated edge. A white sheet was in the bathtub. In the toilet were a bloody

pair of men's boxer shorts and a blue-handled mop. In the kitchen he saw blood smears on the range, the floor, and the door, and a package of trash bags on the floor.

In the bedroom, Officer Tracy observed a box fan just inside the doorway and, next to it, a circular five-pound weight. Bloody bed linens were on a chair and bloodstains were on the bed and on the one sheet still on the bed. On a table next to the bed were a purse and a cordless phone. On a dresser were a man's hat and a quantity of crack cocaine. There was no money found in the purse. A large trash can was in the hallway. On the outside in the back porch area was a green garbage can that contained a broken mop, a pair of loop earrings, a gold necklace, a black pair of jeans, a broken fingernail, a white t-shirt, multi-colored panties, and two green floor mats.

On cross-examination, Officer Tracy, by referring to the evidence log, stated that crack cocaine found in the bedroom weighed .9 grams and was found in the hatband on the hat on the dresser. There was $218 found in a drawer of the dresser. Marijuana, weighing 2.6 grams, was found in the living room. There was $2.10 and the victim's Tennessee drivers' license found in the black Guess jeans located in the outside garbage can. Also found in the residence was a Winchester twelve gauge Model 1300 shotgun and seven slugs.

Sergeant Sammie Ballard of the Memphis Police Department stated he was assigned to the Homicide Bureau at the time of this incident. Ballard and Officer Scott Ledford went to the hospital where the [petitioner] had been taken. Ballard first administered the [petitioner's] Miranda rights and had the [petitioner] sign an acknowledgment. The [petitioner] made an initial statement that he had been knocked out while answering his door at about 4:00 a.m. and was then taken to the hospital. Ballard said the [petitioner] seemed to comprehend the process.

Later in the afternoon, the [petitioner] gave another statement after again being advised of his Miranda rights. This statement was typed and signed by the [petitioner]. In that statement the [petitioner] gave an account of the events as follows. The victim was at the [petitioner's] home when he arrived at 9:00 or 9:30 the previous night. Kevin Ward and the victim's friend, Michelle, were with the victim, and Michelle left thirty minutes later. The [petitioner] and the victim left to attend a movie, but it was closed and they bought food and returned to the [petitioner's] home about 11:30 p.m. The [petitioner] and Ward drank Crown Royal, and the victim drank cognac. Marijuana was smoked. About one hour later, the [petitioner] asked Ward to leave and, after Ward's exit, the [petitioner] and the victim watched television and engaged in petting. Ward returned in an hour, and he and the [petitioner] snorted cocaine in the bedroom. The [petitioner] and victim then went to the bedroom and had sex, and the victim fell asleep. The [petitioner] went into the living room, he and Ward took more cocaine, and he returned to the

bedroom. The [petitioner] wanted to engage in more sex, and the victim resisted, which resulting in arguing. The [petitioner] hit the victim, and they fought, with him striking her several times with his fist in the face and head. She tried to escape, and he struck her head with the weight. The victim fell to the floor of the hallway, and the [petitioner] struck her again with the weight. The [petitioner] got a long knife from the kitchen and stabbed the victim in the neck. Ward was standing in the living room/hallway door, telling the [petitioner] not to kill the victim. The [petitioner] told Ward to help him get rid of the body because she was dead. The [petitioner] attempted to take the victim into the bathroom and put her body in the tub so he could clean up the blood. The [petitioner] could not lift the victim into the tub. He heard the front door slam and supposed that Ward had left to call the police. After locking the front door, the [petitioner] retrieved the knife in order to cut off the arms and legs of the victim and dispose of them in the garbage. After being unsuccessful at severing the bone of the victim's right arm, he decided to place the body into a garbage bag and then into a can to remove from the house. The [petitioner] got the victim's clothes from the bedroom, removed her panties, placed them in a garbage bag, and placed it in a large city cart on the outside. Upon seeing the police come by, the [petitioner] stuck the mop in the toilet and hid behind the front door. The [petitioner] contrived a plan to say that someone broke in and knocked him out. In answer to specific questions, the [petitioner] stated he stabbed the victim once, struck her with the weight twice, and struck her with his fists several times. This was his first date with the victim. The [petitioner] said he and the victim fought in the doorway of the bedroom, and she fell against the end of the couch, but was not on the couch. The [petitioner] said he was both drunk and high, but had not blacked out, and clearly recalled the details recounted. The [petitioner] said he suffered no injury during the incident.

On May 31, the [petitioner] made corrections to his previous statement. The [petitioner] said he caught the victim attempting to steal his money from his dresser drawer, and an argument ensued. The [petitioner] struck the victim and continued to beat her. The [petitioner] claimed the source of his money was from his mother and from cutting yards and selling of a few drugs.

On cross-examination, Ballard testified that the [petitioner] seemed physically and mentally capable of giving a statement on the first occasion they talked. Prior to taking the written statement, Ballard was aware of Ward's allegation that he had seen the [petitioner] beat the victim and ask Ward for help in disposing of the body. Ballard told the [petitioner] of Ward's statement prior to the typewritten statement taken from the [petitioner].

Next, Dr. O.C. Smith, the Shelby County Medical Examiner, testified and was accepted as an expert on pathology. Dr. Smith performed an autopsy on the victim on May 29-30, 1998. He testified that the victim died of multiple injuries. He

described the injuries as blunt trauma to the head, compressive force to the neck, and sharp force to the neck. In addition, the victim suffered defensive wounds to the arms and hands. Dr. Smith stated the five-pound weight could have caused the blunt trauma to the head. The sharp force wounds to the neck were not stab wounds, but a series of multiple incisions resulting in a long, wide, and deep wound. According to Dr. Smith, the knife found at the scene could have caused the neck wound. He described finding petechial hemorrhages, small red areas in the whites of the eyes, that indicate asphyxial-type deaths.

The neck incisions cut through the victim's wind pipe, esophagus, jugular vein on both sides, carotid artery on the right side, and into the front surface of the spine. He opined that there were nine blows to the victim's head. Dr. Smith also testified that he believed the victim was alive when her neck was cut, due to the existence of a heartbeat that caused bleeding into the cut tissues and the blood breathed into her lungs. The presence of sharp force wounds to the hands and fingernails indicated to Dr. Smith that defensive wounds occurred during life. The sharp force neck wound could cause death within one to two minutes.

Dr. Smith testified there were seven separate incisions at the right shoulder and armpit and believed the wound was inflicted after death. No evidence of alcohol or drugs was detected from tests performed on the victim. The doctor's opinion was that the victim experienced physical abuse beyond that necessary to produce death. He also observed that the large amount of blood on the couch in the living room near the hallway door was more blood than would have resulted from the blunt trauma and scalp lacerations alone.

On cross-examination, Dr. Smith stated the victim was five feet, seven inches tall and weighed 166 pounds. He stated that the blows to the victim's head were sufficient to cause death. While it is possible the head blows could cause unconsciousness, he could not determine that if unconsciousness did result. If the blows were the primary reason for death, then unconsciousness would precede death. He also stated that a lay person might believe an unconscious person was dead by the outward appearances. Dr. Smith agreed that the incisions to the victim's neck could have been an attempt to sever the head. The defensive wounds described on the victim's fingernails and hands could have been received while the victim's hands were at her throat, but the doctor agreed he could not say, to a medical certainty, that the hands had to be in that position. The fingernails on the victim were her natural nails, and there was no evidence of applied nails or remnants. The fake fingernail found at the scene could not be linked to any of her natural fingernails. Dr. Smith stated the petechial hemorrhages to the eyes were not the result of the neck incision, but of compression by an undiscovered source. On redirect examination, Dr. Smith clarified that strangulation can occur without leaving a neck mark, and in this case, the neck tissues were disrupted by the incision wounds.

Based on the above facts, the jury returned a verdict of guilt as to first degree murder.

State v. Geraldrick Jones, No. W2002-00747-CCA-R3-CD, 2003 WL 22446138, at *1-6 (Tenn. Crim. App. Oct. 17, 2003), perm. to appeal denied (Tenn. Mar. 8, 2004). The jury imposed a sentence of life without the possibility of parole.

In 2004, the petitioner filed a *pro se* petition for post-conviction relief, which alleged numerous instances of error and misconduct by the police, the State, the trial court, and trial counsel.[1] Counsel was appointed, and the petitioner filed two "amended and supplemental" petitions. The first amended petition alleged that the trial court erred in refusing to suppress evidence derived from blood samples taken from the petitioner or instruct the jury on an inference that could have been drawn from the State's failure to preserve the samples, denying the petitioner's motion to suppress statements taken from him in the days following the offense, and instructing the jury on voluntary intoxication. The second amended petition alleged that trial counsel provided ineffective assistance by not including in the direct appeal record the transcript of the hearing on the petitioner's motion to suppress his inculpatory statements, not arguing to the trial court that the indictment should be dismissed or a jury instruction should be given based on the State's failure to preserve the blood samples, not attempting to suppress evidence derived from the search of the petitioner's home, or objecting to "certain closing remarks"[2] made by the State during the guilt and penalty phases of the trial.

At the evidentiary hearing, the petitioner elected to proceed only on the claims presented in his second amended petition for post-conviction relief. He testified regarding a sketch of the crime scene. He stated that there were three windows in his kitchen. The first, on the top of the door leading from the kitchen to the porch, was approximately six inches high and two feet wide. The second window was next to the door and was two and a half to three feet wide and at least three feet high. The third window was above the sink, approximately two feet wide and high. From the outside, this window was at least eight feet off the ground. The petitioner testified that, at the time of the offense, the first two windows were covered and no one could have seen through them.

The State called trial counsel,[3] who testified that he had practiced law in Memphis for twenty-three years and had tried five capital cases. He testified that he hoped to use in the motion and proof stages of the trial blood samples taken from the petitioner when he gave his first statement to the police. However, the State lost these samples before they could be analyzed. He acknowledged that the State did not challenge the petitioner's claim that he was intoxicated when he committed the offense, that Kevin Ward had testified at trial that the petitioner was intoxicated,

---

[1] Because the petitioner did not offer proof or argument on any of these claims, we will not list them.

[2] The petition did not specify which of the State's remarks were objectionable.

[3] The petitioner was represented at trial by two attorneys. Co-counsel was unavailable as a witness at the post-conviction hearing because of health problems.

that Sergeant Ballard had introduced the petitioner's statement that he was intoxicated, and that the trial court "gave us a good bit of leeway" because the blood samples had been lost. Trial counsel testified that he did not recall any improper closing argument by the State.

On cross-examination, trial counsel agreed, generally, that defense counsel should object to improper closing arguments by the State, include a copy of the suppression hearing transcript in the appellate record if counsel raises an issue related to the hearing, and cite favorable controlling or supporting authority to a court. Counsel testified that he did not recall the location of the windows in the kitchen of the petitioner's home.

The post-conviction court denied the petition, holding that the petitioner failed to prove his claims of ineffective assistance of counsel. Regarding the lost evidence claim, the court found that the petitioner had not proven that trial counsel was deficient or that he was prejudiced by counsel's failure to seek dismissal of the charges or a jury instruction. The court also found that the petitioner had not proven deficiency or prejudice with respect to trial counsel's omission to challenge the search of the petitioner's home. The court found that the petitioner offered no proof as to why trial counsel did not object to the closing remarks by the State. Regarding the claim that trial counsel should have included the suppression hearing transcript in the appellate record, the post-conviction court found that the petitioner had established deficient performance but had not established prejudice because the trial court had correctly ruled that the petitioner's statements should not be suppressed.

## ANALYSIS

The petitioner argues that the post-conviction court erred in holding that he did not prove trial counsel provided ineffective assistance. He contends that trial counsel should have argued to the trial court that, based on State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), he was entitled to dismissal of the indictment or a curative jury instruction because the State failed to preserve his blood samples. He also claims that trial counsel failed to challenge properly the search of his home and improper closing remarks by the State. The State responds that the trial court properly denied the petition for post-conviction relief. As we will explain, we agree with the State.

### I. Post-Conviction Standard of Review

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's

application of the law to the facts of the case is *de novo*, with no presumption of correctness.  See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).  The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court.  See Wiley, 183 S.W.3d at 325; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

## II. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee.  See U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law.  See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective.  The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results."  Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064.  The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . .  No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065.  The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms."  House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated:  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v.

State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

## A. Lost Evidence

The petitioner argues that "[t]he blood samples which the State lost were central to the petitioner's argument that his intoxication rendered it impossible for him to be guilty of premeditated murder." He contends that trial counsel should have argued to the court that the loss of the evidence entitled him to either dismissal of the charges or a curative jury instruction, citing State v. Ferguson as authority. The State argues that we should uphold the determination of the post-conviction court because the petitioner did not present proof to substantiate this claim and was not entitled by Ferguson to dismissal or a jury instruction.

When the State has lost potentially exculpatory evidence, Tennessee courts first analyze whether the State had a duty to preserve the evidence. Ferguson, 2 S.W.3d at 917. If the proof demonstrates that the State has breached a duty to preserve evidence, a court must evaluate (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. Id. The central objective is to protect the defendant's right to a fundamentally fair trial. Id. If, after evaluating all the factors, the trial court determines that a trial without the missing evidence would be fundamentally unfair, the trial court may dismiss the charges, deliver a curative instruction to the jury, or craft such other orders as appropriate to protect the defendant's right to a fair trial. Id.

The post-conviction court found that the petitioner failed to prove this claim:

Petitioner's attorneys never asked the trial judge to dismiss the charges or to give a curative instruction in accordance with Ferguson. At the evidentiary hearing conducted in the post-conviction court, Petitioner offered no evidence relating to this issue other than to admit the transcript of the suppression hearing conducted in the trial court on October 19, 2001. [Co-counsel] handled the motion to suppress and he was not available as a witness at the post-conviction hearing. [Trial counsel] was not

-11-

questioned regarding the alleged failure to move that the charges be dismissed or for a special jury instruction. In this procedural posture it is extremely difficult to ascertain whether the two trial attorneys representing Petitioner rendered deficient performance in failing to raise State v. Ferguson in the various contexts alleged by Petitioner. Accordingly, the Petitioner has failed to establish the deficiency prong of Strickland v. Washington.

In addition, Petitioner has also failed to establish the "prejudice" prong. In the context of the present case, Petitioner has not shown that reliance on State v. Ferguson in the trial court would have given rise to a reasonable probability that the result of the trial would have been different. Had this matter been raised in the trial court, the judge would have determined whether the State had a duty to preserve the evidence and, if so, applied the three-prong balancing test set forth in Ferguson to determine whether the trial, conducted without the lost evidence, would be fundamentally fair. The State did have a duty to preserve the evidence. . . . Having so determined, the first factor to consider is the degree of negligence or bad faith involved. Petitioner failed to show that the State acted in bad faith or in gross negligence. The only conclusion is that the evidence was negligently lost as an act of simple negligence. Furthermore, the biological samples were taken from the Petitioner on May 29, 1998. The motion to suppress was conducted on October 19, 2001. There is no indication in the record when the samples were lost or what efforts were made by the defense to obtain said samples before they were lost.

The second factor addresses the significance of the missing evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available. In this context, the defense contends that the evidence was relevant to show his statements were not voluntarily given, that he was too intoxicated to form premeditation, and that his intoxication was a mitigating factor in sentencing. The missing biological evidence could have bolstered Petitioner's argument that his intoxication prevented him from forming premeditation and was a mitigating circumstance. In this respect, the missing evidence was of some significance. On the other hand, the significance of this evidence is diminished in several respects. First, evidence that Petitioner had been drinking, smoking marijuana and snorting cocaine throughout the night in question was admitted as a part of the State's case and was essentially not disputed by the State. Second, although he may have been somewhat intoxicated, the testimony of Petitioner's roommate and the officers who came in contact with the Petitioner did not support a claim that Petitioner was so intoxicated that he could not form premeditation. Third, the Petitioner did not offer any testimony that he was intoxicated to a degree that he was unable to form premeditation. Fourth, no expert evidence was admitted at trial or at the post-conviction evidentiary hearing as to the effect of intoxication on this [petitioner's] ability to form premeditation and how his degree of tolerance to drugs and alcohol would affect his degree of impairment. Fifth, the fact of

-12-

Petitioner's intoxication was fully raised in both the guilt and sentencing stages of the trial and [Petitioner] was not hindered in the full and complete exposition of his theory of defense.

The third factor to consider is the sufficiency of the convicting evidence. There was no dispute at trial that Petitioner committed the homicide in the present case. The only issue was the degree of homicide and whether the killing was premeditated. On this subject, the State's evidence was overwhelming. Included in the State's proof was the fact that the victim's [sic] was killed with multiple blows, Petitioner told his roommate that he had to kill the victim to prevent his probation from being violated, Petitioner attempted to cut up the body and dispose of it, he attempted to clean up the scene of the crime, and he made up a false story when the police arrived at the scene. The State's proof of premeditation was simply overwhelming. Likewise, the State's proof of aggravation was also overwhelming. The State established four aggravating circumstances.

Applying these Ferguson factors[,] this court finds that Petitioner received a fundamentally fair trial and experienced no measurable disadvantage because of the missing blood evidence. In the context of this case in which the Petitioner had clearly committed a homicide and the only question was the degree of homicide, the trial judge would not have dismissed all charges against the [petitioner]. To think otherwise is absurd. . . . Furthermore, because Petitioner's trial was fundamentally fair, the trial judge would not have been required to give the jury an instruction that it could infer that the evidence would have been favorable to the defense. If the jury had been so instructed, in the context of this case in which the evidence of premeditation was overwhelming, it would not have affected the verdict. Likewise, in the context of this case w[h]ere there was overwhelming evidence of four statutory aggravating circumstances, such an instruction would also have not affected the sentencing decision. The jury already placed great weight on the mitigation, found that the aggravation did not outweigh the mitigation, and spared Petitioner from the death penalty.

The post-conviction court found that the petitioner did not meet his burden of proving that counsel was deficient for not raising State v. Ferguson, or that he was prejudiced by the alleged deficiency. The record supports these determinations.

**B. Failure to Challenge Search**

The petitioner next argues that trial counsel was ineffective in not attempting to suppress evidence derived from the search of the petitioner's home. He argues that the warrantless entry of his home was unjustified by any of the exceptions to the general requirement that a search be preceded by a warrant. He claims that the police "intruded upon the curtilage of the petitioner's

-13-

home" when they looked in the window and saw the victim's body and that the trial court would have found the search to be illegal had trial counsel raised the issue.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides the basis for our analysis:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Additionally, Article 1, section 7 of the Tennessee Constitution provides

> [t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The Tennessee Supreme Court has explained that "[t]he purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials,'" State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967)), and that "'[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment.'" Id. (quoting State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Sneed v. State, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968)). Therefore, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Id. (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). Accordingly, a trial court begins with the presumption that a warrantless search or seizure is unreasonable and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement was applicable at the time of the search or seizure.

The United States Supreme Court has recognized "that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978) (citations omitted). One compelling reason, and an exception to the warrant requirement, can be found under the so-called "exigent circumstances" doctrine. As this court stated in State v. Tyler, 598 S.W.2d 798, 801 (Tenn. Crim. App. 1980), "[w]arrantless searches are per se unreasonable under the Fourth

Amendment unless the search falls within an exception to this rule, such as searches incident to arrest, consent searches, and searches justified by some exigency or emergency." The exigent circumstances exception includes the broadly recognized right of law enforcement officers to act in an emergency situation to protect life. Judge Warren E. Burger, later Chief Justice of the United States Supreme Court, explained in Wayne v. United States, 318 F.2d 205 (D.C. Cir. 1963), the need of officers sometimes to enter a premises without a warrant to take immediate life-saving action:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. . . . A myriad of circumstances could fall within the terms "exigent circumstances" . . ., e.g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within.

Id. at 212.

The United States Supreme Court has noted that it "do[es] not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978) (footnotes omitted). This court stated, in State v. Coulter, 67 S.W.3d 3 (Tenn. Crim. App. 2001), that when applying the exigency exception doctrine "the State 'must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house . . . required immediate assistance.'" Id. at 42 (quoting United States v. Arch, 7 F.3d 1300, 1304 (7th Cir. 1993)). An objective standard is applied when determining the reasonableness of the officer's belief that an emergency situation exists. Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971). The Root court explained the objective standard thusly:

> "In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"

Id. at 364-65 (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 1880 (1968)).

The post-conviction court found that the petitioner had failed to prove that counsel performed deficiently or that a motion to suppress would have been meritorious:

At the evidentiary hearing in the post-conviction court, Petitioner offered evidence relating to his claim that it was impossible to see in the window. Essentially, this was the same evidence introduced before [the trial court] in the motion to suppress and rejected by [the trial court]. Petitioner's testimony claiming that it was impossible to see in the window does not establish this as a matter of fact. Furthermore, Petitioner offered no evidence of any deficient investigation on the part of his attorneys in preparing for the motion to suppress.

Petitioner also has failed to carry his burden of proof to show either the deficiency or prejudice prongs with regard to his claims that his attorneys should have argued that the entry into his house was without probable cause and exigent circumstances and that the officer's action in approaching the house and looking in the window violated the 4th Amendment. The trial judge ruled that entry was accomplished under exigent circumstances to check on the injured in order to save life and limb. The trial judge ruled correctly and the additional arguments now made by the Petitioner would not have resulted in a different outcome on the motion to suppress or the subsequent trial. . . . In this case, the police were advised by [the petitioner's] roommate that an assault had just occurred inside the house he shared with the [petitioner] in which he believed the victim to have just been killed. The roommate accompanied the officers to his home and was present at the time of entry. The entry might have been justified by consent. In any event, having received such information from the roommate, the officers were immediately justified in forcing entry into the home after receiving no answer to their knocks in order to see if the victim was already dead or was injured and needed medical attention. As such, entry was not for the purpose of collecting evidence, but for a community care-taking function.

We agree with the post-conviction court that the search of the petitioner's home was justified by the exigent circumstances exception to the warrant requirement. The police officers had been informed by Kevin Ward that the petitioner was attacking the victim inside the home. Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006). A motion to suppress evidence derived from this search would have been unsuccessful; therefore, trial counsel's decision not to pursue such a motion was not deficient performance and did not prejudice the petitioner.

### C. Improper Closing Arguments

Finally, the petitioner argues that his trial counsel provided ineffective assistance by not objecting to "numerous improper arguments of the prosecutor." He argues that counsel's failure to object to these remarks deprived him of a fair trial. The State responds that the petitioner presented no evidence at the post-conviction hearing to support this claim.

In <u>State v. Thornton</u>, 10 S.W.3d 229, 234-35 (Tenn. Crim. App. 1999), this court discussed the limits upon a prosecutor's final argument:

> In general, closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. <u>State v. Bigbee</u>, 885 S.W.2d 797, 809 (Tenn. 1994). Arguments must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. <u>State v. Middlebrooks</u>, 995 S.W.2d 550 (Tenn. 1999).

Again, the post-conviction court found that the petitioner offered insufficient proof of this claim:

> Petitioner next contends that his trial counsel provided ineffective assistance of counsel in failing to object and preserve for appeal various statements made by the prosecution in its closing arguments. [Co-counsel] was not available as a witness at the post-conviction evidentiary hearing. [Trial counsel] did testify at the hearing but was asked very little concerning the closing arguments. The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions. Attorneys may often choose not to object to damaging evidence for strategic reasons so as to avoid emphasizing the unfavorable evidence. . . . In this case, there is no proof in the record indicating why counsel chose not to object to the now challenged statements. Without testimony from trial counsel or some evidence indicating that the decision was not a tactical one, this court cannot determine that trial counsel provided anything other than effective assistance of counsel. . . . Furthermore, considering the overwhelming evidence of premeditation in the present case and the jury's rejection of a death sentence, any error could not have affected the verdict.

Although the petitioner lists several examples of purportedly improper argument in his appellate brief, he provides no citation to the trial record for any of these remarks. Nor has he included the trial transcript in the appellate record.[4] Without the transcript, we are unable to review the remarks in context and determine whether they should have been objected to. Moreover, as the post-conviction court noted, the petitioner did not ask trial counsel why he did not object to the challenged remarks. As set out above, the petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). The record supports the determination of the post-conviction court that this claim is without merit.

## **CONCLUSION**

---

[4]It is the duty of the appellant to prepare a fair, accurate, and complete record of what transpired in the court below. Tenn. R. App. P. 24(b).

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE